**Krishnan S. Chittur, Esq.**
**Chittur & Associates, P.C.**
**286 Madison Avenue**
**New York, New York 10017**
**Tel: (212) 370-0447**

**and**

**Kenneth B. Fromson, Esq.**
**Finkelstein & Partners, LLP**
**60 Park Place**
**Newark, NJ 07102**
**Tel: (973) 643-2707**
**Fax: (973) 643-2711**
**Attorneys for Plaintiffs and the Class**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEEPA SHANBHAG, and NANDA PAI, individually and on behalf of all others similarly situated, <br>           Plaintiffs, <br><br>       v. <br><br> LARSEN & TOUBRO INFOTECH LIMITED, INC., LARSEN & TOUBRO LIMITED <br>           Defendants. | CASE NO:  2:11-cv-06965-FSH-PS <br><br> JURY TRIAL DEMANDED |

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Deepa Shanbhag and Nanda Pai, by and through their attorneys, state

as follows:

## NATURE OF THE ACTION

1.      In this class action, Plaintiffs Ms. Shanbhag and Ms. Pai assert that

Defendants discriminated against them and other women employees on grounds of

sex/gender and/or pregnancy.  Ms. Shanbhag asserts claims (a) on her own behalf under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq,* and, (b) with Ms. Pai,

class claims under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-4, 5-12. On behalf of themselves and the class, Ms. Shanbhag and Ms. Pai seek compensatory and punitive damages, and injunctive and declaratory relief, together with attorneys' fees and expenses.

## PARTIES

2.      Plaintiff Deepa Shanbhag is a resident of New Jersey who was employed by Defendants.

3.      Plaintiff Nanda Pai is a resident of New Jersey who was employed by Defendants.

4.      Defendant Larsen & Toubro Limited ("L&T") is India's largest technology, engineering, manufacturing and construction conglomerate, with, according to its website, additional interests in electrical and automation, information technology, and other diversified businesses.  Its corporate headquarters is in Mumbai, India, with offices in 45 countries, and manufacturing facilities in India, China, and the Gulf region, employing over 50,000 people.   It has a market capitalization of over $11 billion, and is publicly traded on both the leading stock exchanges in India (Bombay Stock Exchange Limited, and the National Stock Exchange).  Its Global Depository Receipts are listed on the Luxembourg Stock Exchange.   For the quarter ended December 31, 2011, it reported gross revenues of about $3.5 billion. Its United States headquarters is the same as that of its subsidiary and co-defendant.

5.      Defendant Larsen & Toubro Infotech Limited, Inc. ("L&T Infotech") is a wholly-owned subsidiary of L&T and is a foreign for-profit corporation registered to do business in New Jersey.  Its United States offices are located at 2035 Lincoln Highway, Edison, New Jersey.  L&T Infotech is a global IT services and solutions provider.  It

provides information technology and design services to major multi-national corporations such as Citigroup, Chevron, and Sanyo, as well as to governmental entities such as the City of New York and Jersey City.

6.     Upon information and belief, L&T Infotech's operations are integrated with those of its parent L&T.  All its finances are controlled, audited, and managed by its parent L&T.  All members of its board of directors are top managers or directors of its parent L&T, and based in India.  All policies and procedures of L&T Infotech, including labor relations, are decided and/or approved by L&T in India.  Thus, L&T Infotech is controlled and dominated by Defendant L&T.  Both Defendants operate as an integrated enterprise, and accordingly, both Defendants are liable for the claims at bar.

## JURISDICTION AND VENUE

7.     Subject matter jurisdiction exists under 28 U.S.C. §1331, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*  Supplementary jurisdiction exists over the non-federal claims pursuant to 28 U.S.C. §1367.

8.     This Court has personal jurisdiction over Defendant L&T Infotech because its principal offices are in New Jersey, and it regularly conducts business here and from here.

9.     This Court has personal jurisdiction over Defendant L&T because it dominates and controls its subsidiary L&T Infotech's activities, makes all corporate decisions for L&T Infotech, is an integrated enterprise with L&T Infotech, and conducts business in this State.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants, as well as Ms. Shanbhag and Ms. Pai, reside and/or do business in this

judicial district and a substantial portion, if not all, of the activities giving rise to the claims at bar took place in this judicial district.

## CLASS ACTION ALLEGATIONS

11.     Ms. Shanbhag and Ms. Pai bring this action pursuant to Rule 23, Fed. R. Civ. P., on behalf of a class ("Class") of all past, present, and future women employees of L&T Infotech and/or L&T in the United States, including without limitation those persons ostensibly employed as "consultants" or "independent contractors" through non-parties to perform services for L&T Infotech's clients.

12.     Upon information and belief, Defendant L&T Infotech had about 1,500 class members actively employed during the time of Ms. Shanbhag's and Ms. Pai's employment, apart from those whose employment was terminated over the years.[1] Thus, although the precise number of Class members is currently unknown, it is far greater than can be feasibly addressed through joinder.  The members of the Class are so numerous that joinder of all members is impracticable.  Further, the identity of class members can be readily ascertained from Defendants' records.

13.     Common questions of law and fact predominate in this action including, but not limited to, the following:

a.     whether Defendants engaged in unlawful discrimination against Ms. Shanbhag, Ms. Pai and the Class on grounds of their sex and/or gender?

b.     whether Defendants created a hostile work environment for Ms. Shanbhag, Ms. Pai, and the Class members in the workplace?

---

[1] Defendant L&T Infotech has certified to this Court that it has at least 216 class members actively employed directly today.  Upon information and belief, this figure does not include (a) women ostensibly employed as "consultants" or "independent contractors" through non-parties to perform services for L&T Infotech's clients; and (b) women whose services have been terminated.

c.      whether Defendants engaged in discrimination against Ms. Shanbhag, Ms. Pai and members of the Class in matters of compensation or other terms or conditions of employment?

d.      whether the Class should receive prospective injunctive relief?

e.      whether Defendants are liable for compensatory damages and if so, the measure of such damages;

f.      whether Defendants are liable for punitive damages and, if so, the amount of such damages.

14.     Individual litigation of these claims would be impractical and would impair the ability of Class members to protect their interests.

15.     At issue are Defendants' company-wide practices and corporate culture of discrimination against women.   Defendants have acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Ms. Shanbhag, Ms. Pai, and the Class as a whole.  Class members are entitled to injunctive relief to end Defendants' common, uniform, and unfair discriminatory personnel policies and practices, and an end to the hostile work environment for women.

16.     Ms. Shanbhag's and Ms. Pai's claims are typical of those of the Class, and Ms. Shanbhag and Ms. Pai will fairly and adequately protect the interests of the Class.

17.     Ms. Shanbhag's and Ms. Pai's interests do not conflict with those of the Class.

18.     Ms. Shanbhag and Ms. Pai will fairly and adequately represent the Class, and have retained competent counsel experienced in class action litigation.

19.     Ms. Shanbhag and Ms. Pai are not aware of any other proceeding arising out of the issues in this action.

20.     This Court is the appropriate forum for the instant action.  Defendants have their headquarters for the United States in this District, and all activities at issue took place and/or were directed, organized, controlled and/or channeled from here.

21.     Ms. Shanbhag and Ms. Pai anticipate no difficulty in the management of this class action.

22.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, and unfair discriminatory personnel policies and practices, and company-wide culture which can be fairly characterized as sexist and which has created and nurtured a hostile work environment for women.  Defendants have computerized payroll and personnel data that will make calculation of compensatory damages for specific Class members relatively simple.  The propriety and amount of punitive damages are issues common to the Class.

## FACTUAL BACKGROUND

23.     At all relevant times, Defendants engaged in discrimination against women employees at L&T Infotech on the basis of sex/gender with respect to job assignment, compensation and other terms or conditions of employment, and/or by creating a hostile and abusive climate, and/or unlawfully or terminating women employees on false pretenses.

24.     At all relevant times, Defendants also engaged in discrimination against pregnant employees at L&T Infotech on the basis of their pregnancy with respect to job assignment, compensation and other terms or conditions of employment, and/or by

creating a hostile and abusive climate, and/or unlawfully or discriminatorily terminating pregnant employees on false pretenses.

Facts Concerning Ms. Pai

25.    Ms. Pai joined L&T Infotech in February 2006. At that time, she had 13 years of experience in many areas of Human Resources with highly reputable companies, and had been lauded for her performance from top managers in those companies. Despite this experience, Defendants offered her a salary of $44,000.00 per year, which was significantly below what Defendants were paying similarly situated men doing similar work.

26.    When Ms. Pai inquired about this discrimination in pay, Defendants, through Ms. Pai's supervisors/managers, informed her that the lower salary was because she did not have experience in the United States. This reasoning was pretextual.

27.    Further, Defendants hired Ms. Pai ostensibly for the position of "Manager – Technical Recruitment." In fact, the title was a misnomer because Ms. Pai had no managerial or supervisory responsibilities over any other employees, and she had no managerial or supervisory discretion. Her duties were entirely administrative and ministerial; she was simply to carry out instructions from Defendants' male managers/supervisors.

28.    Upon information and belief, Defendants designated Ms. Pai as a manager in order to avoid paying her overtime which is mandated by Federal and State law for non-managerial employees.

29.    In May, 2007, Ms. Pai received an excellent performance review and was promised a significant increase in salary to be on par with male colleagues in Defendants' Human Resources Department.

30.     Ms. Pai expressed her dissatisfaction with the discrimination in salary. Thereupon, Defendants, through Ms. Pai's supervisor/manager, deprecated her with sexist comments. Defendants, through Ms. Pai's supervisor/manager, commented that her income was nothing more than a "bonus" for her family. She had nothing to worry about, according to them, because her husband was earning and her salary did not matter. Hence, they said, she should not complain about her lower salary as compared to male employees doing similar work.

31.     Ms. Pai submitted a resignation from her employment. Thereupon, Defendants, through Ms. Pai's supervisor/manager, commenced a search for a replacement for her. Defendants, through Ms. Pai's supervisor/manager, issued specific instructions that the new employee to be recruited for replacing her should preferably be a man, not a woman, and certainly not a pregnant woman.

32.     However, Ms. Pai's performance had been excellent, and through her efforts and initiative, Defendants had curtailed certain costs significantly. Accordingly, Defendants, through a senior manager, sought to convince Ms. Pai, with promises of increases in pay and bonuses, to withdraw her resignation. They specifically represented that the discrimination in pay she was then experiencing would be remedied. Relying upon these representations, Ms. Pai withdrew her resignation, and continued her employment with Defendants.

33.     In July, 2008, Ms. Pai informed Defendants, through Ms. Pai's supervisor/manager, about her decision to have a second child. Defendants, through Ms. Pai's supervisor/manager, bluntly told her that in such case, she would be required to choose between her family and her career at L&T Infotech.

34.     Around that time, much media coverage focused on the issue of visa fraud by companies in information technology. The U.S. Attorneys' office in New Jersey had indicted several technology companies such as Cygate Software and Vision Systems, and their managers. These indictments were widely reported in the local press and in the Indian American news media. A report issued by the United States Citizenship and Immigration Services (USCIS) stated that an astonishing 13% of petitions filed for H-1 B visas on behalf of employers were fraudulent, and another 7% contained some sort of technical violations. *See also* Moira Herbst, *High Rate of H1-B Visa Fraud, Business Week*, Oct. 8. 2008.

35.     Defendants became concerned with potential liability for having submitted false documents to the United States government in connection with H-1 B visa applications, and for having indulged in fraudulent misconduct concerning non-immigrant visas. To address these concerns, Defendants commissioned an audit of their immigration records and procedures by Ernst & Young.

36.     Ernst & Young completed the audit, and submitted a report to Defendants in October 2008. That report revealed significant procedural and substantive shortcomings and documentary discrepancies reflective of widespread visa fraud in Defendants' applications to the United States government for visas on behalf of employees and potential employees that were sponsored by Defendants for admission to the United States.

37.     Defendants' immigration processing department was in India. That department was comprised of a manager and about 10 employees. Those employees in India were primarily responsible for all of the visa application preparation, including investigation and determination of "prevailing wages" in various counties in the United

States; backup documentation and verification of information submitted in support to the U.S. government; amendments to the applications; and extensions of visas. Ms. Pai's duties were essentially administrative and ministerial in nature: she had to process these documents received from India for signature by her superiors for submission to the U.S. government.

38. Nevertheless, Defendants used the opportunity to scapegoat Ms. Pai, and blame her for mistakes and omissions which had been identified by the Ernst & Young audit. In fact, as Defendants well knew, to the extent the mistakes were inadvertent and attributable to sloppiness, they were, in fact, committed by Defendants' employees located in India. With respect to those infractions which were willful, Defendants' own managers/supervisors were singularly responsible; as stated earlier, Ms. Pai had no managerial or supervisory responsibilities.

39. To cover up the serious problems identified by the Ernst & Young audit, Defendants, through Ms. Pai's supervisor/manager, systematically backdated and/or fabricated documents in massive numbers. Defendants were aware that they had made false statements to the United States government under penalties of perjury, and to evade liabilities and penalties therefor, willfully sought to cover up that misconduct by such backdating and/or fabrication.

40. Ms. Pai was extremely concerned and distressed at this massive cover-up operation.

41. Ms. Pai's distress was compounded when she discovered that on many such backdated documents, her signatures had been forged. When she raised this issue with Defendants, she was advised to stay silent.

42.     Further, Defendants had routinely made misrepresentations about the wages paid to employees to the United States government in the visa applications. Employees were not paid the wages which Defendants had represented in their H1-B applications to the U.S. government.   When Ms. Pai pointed this out, Defendants, through Ms. Pai's manager/supervisor, asked her to stay silent.

43.     Moreover, under federal law concerning issuance of permanent immigration visas – what are popularly called "green cards" - Defendants were required to advertise and solicit applications for the position occupied by the employee for whom they were seeking the green card, so as to represent to the U.S. government that no locals were available therefor despite good faith, best efforts.  Defendants, through Ms. Pai's supervisor/manager, informed her that every application that was received in response to such advertisements was rejected in advance, and directed her to record pretextual reasons for such rejection.  Ms. Pai believes that this was in furtherance of Defendants' scheme to falsely represent to the U.S. government that Defendants had made good faith, best efforts at local recruitment.

44.     Ms. Pai was increasingly concerned and distressed at the immigration fraud which appeared to be rampant in Defendants' workplace.  These problems included, without limitation,

a.     Falsely certifying to the U.S. government in H-1B visa applications that notices inviting applications for the position for which a foreign worker was being recruited had actually been posted in the Defendants' notice board as well as in Defendants' client's workplace where the foreign worker was to provide services, when no such notices had been posted anywhere;

b.  Changing the location of the employee from that for which the U.S. government had granted the H1-B visa;

c.  Failing to pay the wages which had been certified to the U.S. government in the H1-B visa application and on the basis of which that application had been granted;

d.  Falsifying applicants' experience in applications for extending H1-B visas in order to avoid having to pay the higher wages attendant to such experience;

e.  Providing false job descriptions in the H1-B applications to the U.S. government, which descriptions most often had little to do with the work the employee actually was to do or, actually did after arrival in the United States;

f.  Failing to keep proper Public Access Files as required by federal and state law, including without limitation, documents mandated by law such as wage rate statement, actual and required wage memo, prevailing wage document, job posting,  and benefits offered;

g.  Providing false information to the U.S. government in applications for L1-B visas about the location where the individual employee would be working, about the task they were being brought into the U.S. to perform, and their reporting responsibilities;

h.  Providing false job description to the U.S. government in connection with green card applications; most frequently, the concerned employees' actual work had nothing to do with the job description at all;

i.  Circumventing the H1-B visa quotas under federal law by applying for and obtaining business visas based on false representations to the U.S. government. Although such visa-holders are barred from employment here, Defendants routinely

violated this provision by bringing employees under such visas, had these employees work even on client sites, and reaped humongous profits by violating federal law.

45.     Ms. Pai believes that she was being made the scapegoat for the Ernst & Young audit deficiencies because Defendants, through Ms. Pai's supervisor/manager, knew that Ms. Pai was planning to have another child.

46.     Furthermore, Ms. Pai was very concerned and distressed at being made the centerpiece of Defendants' massive immigration fraud.  Her signatures had been forged in some documents, and she was not aware of the number of such forgeries or just what else had been filed falsely under her name and/or signature.

47.     As a result, Ms. Pai became increasingly anxious that she was being set up to be the fall person for these massive immigration violations, and was constantly in a state of high anxiety.   This drastically affected her lifestyle and personal relationships. But she needed the income from the job, and could not afford to resign.

48.     In January, 2009, Ms. Pai informed Defendants that she was pregnant with her second child.  Defendants, through Ms. Pai's supervisors/managers, substantially *increased* her workload so that she had to put in grueling 18 hour workdays on a regular basis.   When she protested, Defendants, through Ms. Pai's supervisors/managers, blamed her for being "weak."  They attributed that weakness to her pregnancy, and bluntly told her, again, that she should quit her employment with L&T Infotech if she wanted to be a mother.  Ms. Pai believes that Defendants did so in order to frustrate her into resigning.

49.     When Ms. Pai did not resign, Defendants placed Ms. Pai two months later in what they called a "performance improvement plan", to set her up for terminating her employment.  To hasten her departure, Defendants gave Ms. Pai impossible deadlines to

meet for the humongous amount of work which they were piling on her. They specifically directed her to backdate and/or fabricate documents to coverup their false statements to the U.S. government. Simultaneously, they rejected her plea for any help or support staff, and tersely reminded her that she could resign at any time.

50.     Ms. Pai was extremely troubled. Her health was very seriously affected by the demands being placed on her by Defendants. She seriously contemplated resigning her employment with Defendants. However, she needed the job and hence, had no choice but to tolerate the abuse and continue working in the intensely hostile environment.

51.     As a consequence, Ms. Pai had to work 18 hours a day, often six days a week trying to keep up with the heavy workload placed upon her by Defendants. She processed more than 800 visa applications on her own, single-handedly, in New Jersey. These applications and supporting documents had been received from Defendants' offices in India and had to be vetted, reviewed, and processed to be submitted to the U.S. government.

52.     Defendants did not pay Ms. Pai any overtime.

53.     The stress and tension placed upon Ms. Pai by Defendants, through Ms. Pai's' supervisors/managers, caused Ms. Pai's health to deteriorate significantly. Eventually, she had to be admitted to the emergency room in the local hospital. In fact, she was on the verge of miscarriage of the second child that she and her family wanted so fondly. She was peremptorily ordered by her physicians to stay on complete bed rest for the duration of her pregnancy. Thereupon, Ms. Pai went on maternity leave and so informed Defendants.

54.     After delivery of the baby, Ms. Pai called Defendants, through her supervisors/managers, to inform them of her impending return to work after maternity leave. Defendants, through her supervisors/managers, contemptuously inquired about how she could get back to work and have the heart to leave a little, nursing baby in daycare.

55.     Ms. Pai was disturbed at their attitude, but, as stated earlier, needed the income - especially with the added expenses of the newborn. She returned to work, whereupon Defendants, through her supervisors/managers, demoted her and made her report to a colleague who had, before her maternity leave, been her peer in Human Resources.

56.     Further, Defendants pointed out that she had not complied with their earlier directions to her, which directions had been issued before she went on maternity leave, for massive backdating and fabrication of documents to coverup the immigration fraud. They reinstated the "performance improvement plan." Treating Ms. Pai with increased hostility and contempt, Defendants resumed assigning her mounds of work with unrealistic deadlines so as to overwhelm her into resigning.

57.     Ms. Pai once again attempted to persuade Defendants to be reasonable. Once again, Defendants, through her supervisors/managers, categorically reminded her that she had to choose between her job at L&T Infotech and raising a family.

58.     Ms. Pai, now a mother of two children including an infant who was barely a few months old, tried to leave the office at regular hours. Defendants berated her for this, accusing her of neglecting her work and of ignoring her responsibilities to Defendants merely because she would not stay late nights.   Defendants ignored that Ms.

Pai routinely came to work much earlier than the other employees, and routinely worked through lunch.

59.     Defendants' male employees did not arrive as early as Ms. Pai; in fact, they arrived much later.  Additionally, other male employees took 2-3 hour lunch breaks.

60.     Defendants, through Ms. Pai's supervisors/managers, threatened Ms. Pai with termination.  They expressly told her that if she did not stay beyond 7 or 8 p.m. her employment with Defendants would be terminated.

61.     Further, Ms. Pai requested that she be permitted use of a room with some privacy in order to pump breast milk thrice a day for feeding her infant child.  Even though this request would have cost Defendants nothing, and even though it could have been easily accommodated since Defendants' offices had many such rooms which were unused, Defendants, through Ms. Pai's supervisor/manager, derisively asked Ms. Pai to pump breast milk in conference rooms.  Those rooms were not completely private, had glass openings, and could be seen through by anyone passing through the corridors.  Ms. Pai believes that Defendants, through Ms. Pai's supervisor/manager, refused this innocuous request in order to humiliate her and subject her to heightened anxiety at loss of privacy.

62.     Eventually, Defendants terminated Ms. Pai's employment on June 14, 2010.  Ms. Pai believes that Defendants' termination was due to unlawful discrimination based on her sex/gender and/or pregnancy.

Facts Concerning Ms. Shanbhag

63.     In Fall 2010, Defendants advertised a job opening for the position of "Business Analyst."  Ms. Shanbhag responded to the advertisement, and contacted

Defendants. However, Defendants asked her to apply for that job through a non-party

vendor, System Guru.

64. Ms. Shanbhag was perplexed at having to approach a third party for a job

with L&T Infotech. Nevertheless, with much reluctance, she contacted System Guru for

the job.

65. Defendants had apparently alerted System Guru to Ms. Shanbhag's

inquiry about the posted job. As a result, the System Guru manager berated Ms.

Shanbhag for contacting Defendants directly, and categorically told her that she could

*never* work with Defendants unless she went through System Guru. "I don't care who

you know, you will NOT work with L&T unless you are sponsored by us," System Guru's

manager told her.

66. Left with no choice, Ms. Shanbhag agreed. She was hired by Defendants

as an allegedly "independent contractor" through System Guru on October 14, 2010.

67. Upon information and belief, the contract with System Guru and L & T

Infotech was a "contract to hire". Upon completion of the contract period, L & T Infotech

was to hire Ms . Deepa Shanbhag as an employee. The contractual period was to end

after three months, on January 14, 2011.

68. Throughout this period, Ms. Shanbhag worked exclusively with

Defendants at Defendants' offices. She never went to System Guru's offices, and had no

contact whatsoever with System Guru, save and except for faxing the weekly time-sheets

to be paid.

69. At the end of that 3-month "contract to hire," Defendants were pleased

with Ms. Shanbhag's performance, and asked Ms. Shanbhag to continue to work with

Defendants. However, Defendants' manager attempted to prolong the contract period

with System Guru.  Ms. Shanbhag strenuously objected.  Thereupon, Defendants told Ms. Shanbhag that they employed staff only through non-party vendors, even though the job openings were posted under Defendants' own name.  Ms. Shanbhag informed Defendants that in that case, she was willing to be sponsored by another vendor but not System Guru.

70.     Faced with this dilemma, Defendants threatened to terminate Ms. Shanbhag's services.  Faced with that threat, Ms. Shanbhag agreed to extend the contractual period with Ms. Shanbhag, through System Guru, for two weeks.

71.     At the end of that two-week period, Ms. Shanbhag again inquired with Defendants about her employment with L&T Infotech.  Defendants thereupon offered her a job as a full-time employee, complimenting her on her performance over the contractual period.  Ms. Shanbhag joined Defendants as an L&T Infotech employee on January 25, 2011.

72.     In early 2011, Ms. Shanbhag discovered that she was pregnant.  She began experiencing morning sickness and weight gain.  This was obvious and clearly noticeable; in fact, her supervisor/manager commented loudly in front of her colleagues that she had become "fat" and asked colleagues if they thought Ms. Shanbhag had gained weight.

73.     Ms. Shanbhag's colleagues were aware of her pregnancy.  She had conversations with a colleague on ways to manage her increasing morning sickness and other incidents of pregnancy.

74.     On March 2, 2011. Ms. Shanbhag formally informed Defendants' Human Resource personnel that she was expecting and requested a copy of the maternity benefits.

75.     Not receiving any response thereto, Ms. Shanbhag reiterated that request formally on March 3, 2011, and went to meet her manager/supervisor. At that meeting, she verbally informed Defendants, through her manager/supervisor, that she was pregnant. Due to morning sickness, she requested permission to come to the office a little later than usual, for which she would compensate by staying late in the evenings.

76.     Defendants, through Ms. Shanbhag's manager/supervisor, did not appear surprised at all. In a matter-of-fact manner, Defendants, through Ms. Shanbhag's manager/supervisor, appeared to readily consent to this request. Ms. Shanbhag believes that Defendants were well aware of her pregnancy before that meeting.

77.     On the very next day, March 4, 2011, Defendants terminated Ms. Shanbhag's employment. They informed her that the reason for that termination was that her position was being eliminated.

78.     Ms. Shanbhag believes this was pretextual. In fact, shortly after terminating Ms. Shanbhag's employment, Defendants sought to fill that position. Moreover, that position could not be moved offshore because it required interaction with Defendants' clients here.

79.     Thus, Ms. Shanbhag was terminated thirty-eight (38) days after Defendants recruited her as an employee – after 3 ½ months as an ostensibly "independent" contractor – exactly one day after she formally informed them of her pregnancy formally, and about two weeks after Defendants apparently learnt of her pregnancy informally.

80.     Throughout her employment with Defendants, Defendants, through Ms. Shanbhag's supervisors/managers, consistently applauded her performance and her analytical skills. No one ever questioned or criticized her performance in any manner at

any time.  Even at the time of terminating her services on March 4, 2012, Defendants never raised or mentioned anything about her performance.

81.     Nevertheless, in proceedings before the EEOC which took place months later, Defendants claimed that one Mr. Sanjay Mali had allegedly complained on February 25, 2011, about Ms. Shanbhag's performance and sought to terminate her services.  According to Defendants, Mr. Mali allegedly made this complaint barely ten days after Ms. Shanbhag's colleagues came to know about her pregnancy.

82.     Mr. Mali was never Ms. Shanbhag's manager/supervisor.  He never gave her any directions or work, and she never reported to him.  Further, throughout Ms. Shanbhag's employment with Defendants, Ms. Shanbhag's interaction with Mr. Mali was extremely limited, lasting barely a few minutes on a couple of occasions.  Thus, Mr. Mali had no basis to evaluate or make any comments about Ms. Shanbhag's performance.

83.     Further, Mr. Mali's alleged complaint of February 25, 2011, contained statements which were factually baseless and false.

84.     Ms. Shanbhag believes that Mr. Mali's alleged complaint of February 25, 2011 – assuming it to have been made - was a set-up in order to provide Defendants with a paper-basis to terminate her employment soon after Defendants came to know of her pregnancy.

85.     Moreover, Ms. Shanbhag was paid less than half of what similarly situated male employees doing similar work were paid at the same time.

Other Illustrations of Defendants' Discriminatory Conduct Towards Women Employees

86.     During their employment, Ms. Shanbhag, Ms. Pai, and other women employees, were repeatedly subjected to an unrelenting barrage of sexual harassment

and were witness to sexist criticism of other women employees from Defendants' managers.  In fact, Ms. Shanbhag's immediate supervisor told her she was replacing "a dreadful woman who did not know how to dress."

87.     Defendants openly declared their hostility to women employees with derogatory name-calling such as "gossip mongers."  They routinely derided an elderly woman employee as being "old" and doing nothing but "just taking a salary".

88.     On one occasion, Defendants' manager/supervisor told Ms. Shanbhag that a woman employee was being transferred because of her "dreadful appearance" and inability to communicate with men.

89.     On another occasion, Defendants described a woman in management as having obtained that position "because the locals made her sit on their head."

90.     Another woman employee who complained about sexual harassment from her supervisor was told not to come to work too early or too late and to "avoid being alone with" her harasser.  Defendants' Human Resources personnel also told that woman employee to avoid "being alone at your workstation." When the woman returned from maternity leave she was given less work, and Defendants' manager/supervisor told Ms. Shanbhag that that woman was "unfit to carry out certain tasks now that she's had a baby."

91.     On another occasion, Ms. Shanbhag went to her supervisor's office to discuss a project.  The office had an odor of deep heat or some other muscle ointment. She asked if he was injured, whereupon he replied, "My back aches because I make too much love."

92.     On yet another occasion, when Ms. Shanbhag was walking down the corridor, her supervisor remarked – in a voice loud enough to be heard across the entire

floor - that Ms. Shanbhag had "put on weight" and "become fat." He then asked other employees if they thought Ms. Shanbhag looked fat to them.

93.     Defendants had a practice and pattern of demoting women or assigning them demeaning work upon their return from maternity leave in order to humiliate them into resigning and quitting L&T Infotech.

94.     Defendants fostered an intense climate of hostility towards women at the workplace that was both subjectively and objectively threatening to Ms. Shanbhag, Ms. Pai, and other Class members, interfering with their ability to perform their work.

95.     In fact, Defendants routinely employed vendors to supply them with "consultants" or independent contractors, instead of hiring these persons directly as employees. [2] These vendors shared and reiterated Defendants' intense hostility to women, and reflected Defendants' sexist corporate culture.   While placing recruitment orders with vendors, Defendants expressly told the vendors to recruit men, not women, and certainly not pregnant women.  Plaintiffs believe that Defendants employed this practice in order to evade the mandates of Title VII and other anti-discrimination statutes.

96.     This climate of hostility culminated in Ms. Shanbhag's and Ms. Pai's unlawful and wrongful termination by Defendants on the basis of their sex/gender and/or pregnancy.

97.     Other members of the Class have faced similar hostility and discrimination from male supervisors.

Ms. Shanbhag's Exhaustion Of Administrative Remedies

---

[2] Some of these vendors are spouses or close relations of Defendants' managers/supervisors.  Defendants' top management is well aware of such routine self-dealing.

98.     Ms. Shanbhag filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

99.     Ms. Shanbhag has properly exhausted her administrative remedies for her Title VII claims by timely filing the instant lawsuit within ninety (90) days after receiving a notice of right to sue from the EEOC.

## COUNT I

(Violations of Title VII, 42 U.S.C. §§ 2000e *et seq.* –
Intentional Discrimination based on sex/gender)

100.    Ms. Shanbhag repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

101.    This claim is brought individually on behalf of Ms. Shanbhag.

102.    Defendants intentionally subjected Ms. Shanbhag to discrimination based on sex/gender.  Defendants routinely made comments regarding female employees' appearance and made job assignment decisions for female workers based on whether they had children or not.

103.    Furthermore, Defendants engaged in systematic discrimination against Ms. Shanbhag by wrongfully and unlawfully terminating her, under false pretenses, on the basis of her sex and/or pregnancy.

104.    Ms. Shanbhag has suffered economic losses in the form of back and front pay, employment benefits and perquisites, apart from mental anguish, humiliation and emotional distress as a direct result of Defendants' discriminatory practices.

105.    Accordingly, Ms. Shanbhag respectfully requests that the Court award judgment and relief against Defendants as sought herein including without limitation,

compensatory and punitive damages, attorneys' fees and expense, and all such legal and equitable remedies to which Ms. Shanbhag is entitled for violations of Title VII.

## COUNT II

### (Violations of Title VII, 42 U.S.C. §§ 2000e, Wrongful Termination)

106.   Ms. Shanbhag repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

107.   This claim is brought individually on behalf of Ms. Shanbhag.

108.   Defendants engaged in unlawful discrimination by their wrongful termination of Ms. Shanbhag just five weeks after they made her a permanent employee and just one day after she told them of her pregnancy.  This conduct violates Title VII of the Civil Rights Act of 1964.  Such wrongful termination constitutes intentional discrimination under federal law.

109.   Accordingly, Ms. Shanbhag respectfully requests compensatory and punitive damages, as well as equitable relief, to remedy the violation of Title VII alleged herein, together with attorneys' fees and expenses, including without limitation expert fees and expenses incurred in connection with this litigation.

## COUNT III

### (Violations of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq*)

110.   Ms. Shanbhag and Ms. Pai repeat and reallege each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

111.   This claim is brought individually on behalf of Ms. Shanbhag and Ms. Pai, as well as on behalf of the Class.

112.   Defendants have intentionally subjected Ms. Shanbhag, Ms. Pai and the Class to discrimination based on sex and/or gender.  Defendants routinely made sexist

comments regarding women's salaries being nothing more than a "bonus," asking women to choose between their career and their families, apart from unrestrained observations about their appearance, Defendants' managers/supervisors and/or other male employees' sexual exploits, and female workers' inability to do tasks based on their having had a child.

113.   In addition, Defendants subjected Ms. Shanbhag, Ms. Pai and the Class to hostile work environment suffused with discrimination based on sex, all in violation of The New Jersey Law Against Discrimination (NJLAD).   Defendants either knew or should have known of this intensely hostile work environment permeated with harassment and verbal abuse against Ms. Shanbhag, Ms. Pai and the Class.   By failing and/or refusing to act or otherwise take any remedial action, Defendants condoned, sanctioned, tolerated, ratified or otherwise approved this discriminatory hostile work environment.

114.   Furthermore, Defendants have engaged in systematic discrimination against Ms. Shanbhag and Ms. Pai by wrongfully and unlawfully terminating their employment[3] under false pretenses, on the basis of sex and/or gender.

115.   Ms. Shanbhag, Ms. Pai and the Class have suffered economic loss, loss of back and front pay, denial of employment benefits, and mental anguish, humiliation and emotional distress as a direct result of defendants' discriminatory practices.

---

[3] Defendant L&T Infotech has certified to this Court that the number of women employees, including "consultants" and allegedly independent contractors recruited through vendors, over the past two years is less than 20.  Dkt. 63.  In reliance upon that certification, Plaintiffs do not assert this specific portion of this claim, *i.e.*, for wrongful termination based on sex and/or gender, on behalf of the class.  If that certification proves to be inaccurate in the course of discovery, Plaintiffs reserve their right to seek class certification for this specific portion of the claim also.

116.    Accordingly, Ms. Shanbhag and Ms. Pai respectfully request that the Court award judgment and relief against Defendants as sought herein including without limitation, compensatory and punitive damages, attorneys' fees and expense, including without limitation expert fees and expenses incurred in connection with this litigation, and all such legal and equitable remedies to which Ms. Shanbhag, Ms. Pai and the Class are entitled for violations of New Jersey Law Against Discrimination, N.J.S.A. 10:5-12, *et seq.*

## JURY TRIAL DEMAND

117.    Ms. Shanbhag, Ms. Pai and the Class demand a trial by jury on all issues so triable.

WHEREFORE, Ms. Shanbhag and Ms. Pai, on behalf of themselves and the Class, demand judgment and pray for relief against Defendants as follows:

a.    Determining that the instant action be maintained as a class action pursuant to Rule 23, Fed. R. Civ. P., and appointing Ms. Shanbhag and Ms. Pai to be the Class Representatives, and Chittur & Associates, P.C., to be Class Counsel, and Finkelstein & Partners, LLP to be Local Counsel to the Class;

b.    Awarding compensatory, punitive, and/or treble damages to Ms. Shanbhag, Ms. Pai, and Class members in such amount, not less than $100 million, as may be determined after discovery and trial including without limitation back pay, front pay, benefits, and such other amounts;

c.    awarding a declaratory judgment that Defendants' acts and practices at issue are unlawful and violate Title VII, 42 U.S.C. §§ 2000e *et seq*, and New Jersey Law Against Discrimination N.J.S.A. 10:5-12, *et seq*;

d.  awarding appropriate declaratory and injunctive relief against Defendants including without limitation,

   i.  Reinstatement of all Class members who may be desirous of reinstatement;

   ii.  Restraining Defendants from engaging in any discriminatory conduct or policies, practices, customs, and usages set forth herein;

   iii.  Requiring Defendants to institute and implement policies, practices, and programs to provide equal employment opportunities for women, and that they eradicate the effects of past and present unlawful employment practices;

e.  awarding Ms. Shanbhag, Ms. Pai and Class members the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements; and

f.  for such further and other reliefs as may be just and proper.

**Dated:  May 17, 2012**                    **Chittur & Associates, P.C.**

                                   /s/Krishnan S. Chittur
                                   Krishnan S. Chittur, Esq. (KC 9258)
                                   286 Madison Avenue Suite 1100
                                   New York, NY 10017
                                   Tel: (212) 370-0447

                                          and

                                   **FINKELSTEIN & PARTNERS, LLP**

                                   /s/Kenneth B. Fromson
                                   By:  Kenneth B. Fromson, Esq. (KF 8086)
                                   60 Park Place
                                   Newark, NJ 07102
                                   Tel: (973) 643-2707
                                   Fax: (973) 643-2711
                                   Attorneys for Plaintiffs and the Class